SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
DAVID A. SCHWARZ, Cal. Bar No. 159376
dschwarz@sheppardmullin.com
JAY T. RAMSEY. Cal. Bar No. 273160
jramsey@sheppardmullin.com
ALEXANDRA M. JACKSON. Cal. Bar No. 327689
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701

| | |
|---|---|
| LAW OFFICE OF MARK W. BUCHER<br>Mark William Bucher (Cal. Bar No. 210474)<br>markb@calpolicycenter.org<br>18002 Irvine Blvd Ste 108<br>Tustin, CA 92780-3321<br>Telephone:   714.573.2201<br>Facsimile:   714.573.2297 | CENTER FOR INDIVIDUAL RIGHTS<br>Michael E. Rosman<br>rosman@cir-usa.org<br>1100 Connecticut Ave., NW, Suite 625<br>Washington, DC 20036<br>Telephone:  202.833.8400<br>Facsimile: 202.833.8401<br>(*pro hac vice* application forthcoming) |

*Attorneys for Plaintiffs*
Jeffrey I. Barke, Ed Sachs, Laura Ferguson,
Jim Reardon, Leighton Anderson,
Phillip Yarbrough, and Rodger Dohm

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jeffrey I. Barke, Ed Sachs, Laura Ferguson, Jim Reardon, Leighton Anderson, Phillip Yarbrough, and Rodger Dohm,<br><br>Plaintiffs,<br><br>v.<br><br>Eric Banks, Erich Shiners, Arthur A. Krantz, and Lou Paulson, in their official capacities as members of the California Public Employment Relations Board ("PERB"); and J. Felix De La Torre, in his official capacity as General Counsel of PERB,<br><br>Defendants. | Case No. 8:20-cv-00358-JLS-ADS<br><br>**SECOND AMENDED PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Date:    May 1, 2020<br>Time:    10:30 a.m.<br>Courtroom:  10A |

-1-

## **NOTICE OF MOTION**

PLEASE TAKE NOTICE that on Friday, May 1, 2020, at 10:30 a.m., in Courtroom 10A, 10th Floor, of the Ronald Reagan Federal Building and United States Courthouse, located at 411 W. Fourth St., Santa Ana, California, 92701, the Honorable Josephine L. Staton presiding, or as soon thereafter as the matter may be heard by the Court, plaintiffs Jeffrey I. Barke, Ed Sachs, Laura Ferguson, Jim Reardon, Leighton Anderson, Phillip Yarbrough, and Rodger Dohm (collectively, "Plaintiffs") will and hereby do move for a preliminary injunction enjoining defendants Eric Banks, Erich Shiners, Arthur A. Krantz, and Lou Paulson, in their official capacities as members of the Public Employment Relations Board ("PERB") and J. Felix De La Torre, in his official capacity as General Counsel of PERB, (collectively, "Defendants"), from enforcing California Government Code section 3550 against Plaintiffs. For reasons set forth in Plaintiffs' Memorandum of Points and Authorities, Section 3550 violates the First Amendment of the United States Constitution and California law.

This motion is based on this Notice of Motion, the Memorandum of Points and Authorities in support thereof, the supporting declarations of Jeffrey I. Barke, Ed Sachs, Laura Ferguson, Jim Reardon, Leighton Anderson, Phillip Yarbrough, and Rodger Dohm filed at ECF Dkt. Nos. 7 through 13, Plaintiffs' Complaint filed at ECF Dkt. No. 1, Plaintiffs' Request for Judicial Notice filed at ECF Dkt. No. 14, and other pleadings, and upon such other matters as may properly come before the Court.[1]

---

[1] Plaintiffs' previously filed the Motion and set it for hearing on March 27, 2020. Thereafter, Judge Staton was assigned to the case, and March 27, 2020 was not available on her calendar. Accordingly, Plaintiffs re-filed an Amended Motion and set it for hearing in compliance with Judge Staton's rules and procedures on April 24, 2020. Plaintiffs received notice from counsel for Defendants that they were unavailable on April 24, 2020, but were available on May 1, 2020. Because

1 | Dated:  February 26, 2020

2

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4

By      */s/ David A. Schwarz*
5                           DAVID A. SCHWARZ

6    LAW OFFICE OF MARK W. BUCHER
         Mark William Bucher
7

8    CENTER FOR INDIVIDUAL RIGHTS
         Michael E. Rosman

9    Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26 _____

27  that date is open on the Court's calendar, Plaintiffs are filing this Second Amended
    Motion.  Plaintiffs are not re-filing the supporting declarations and the supporting
28  request for judicial notice.

-3-

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................... 10

II.     STATEMENT OF FACTS .................................................................. 11

        A.      Section 3550 ................................................................... 11

        B.      The Plaintiffs ................................................................. 15

III.    STANDARD OF REVIEW ................................................................ 18

IV.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS .................. 20

        A.      Elected Officials Must Have Wide Latitude To Express Their
                Views On Political Or Policy Issues, And Any Law Restricting
                Such Speech Is Subject To Strict Scrutiny. ............................ 20

        B.      Section 3550 Is A Blatantly Unconstitutional Form Of Viewpoint
                Discrimination ................................................................ 23

        C.      Section 3550's Vague And Overbroad Terms Cannot Survive
                Constitutional Scrutiny. ...................................................... 25

        D.      Section 3550 Chills The Speech Of Elected Officials Like
                Plaintiffs. ........................................................................... 26

        E.      Because Section 3550 Is Not Narrowly Tailored To Achieve A
                Compelling State Interest It Cannot Survive Strict Scrutiny. ........ 30

V.      PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A
        PRELIMINARY INJUNCTION ......................................................... 32

VI.     THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS'
        FAVOR, AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC
        INTEREST ...................................................................................... 34

VII.    CONCLUSION ............................................................................... 34

## TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Beverage Ass'n v. City & Cty. of San Francisco*
    916 F.3d 749 (9th Cir. 2019) .................................................................... 32, 34

*Ariz. Right to Life Political Action Comm. v. Bayless*
    320 F.3d 1002 (9th Cir. 2003) ............................................................... 19

*Arkansas Writers' Project, Inc. v. Ragland*
    481 U.S. 221 (1987) ............................................................................. 30

*Blair v. Bethel Sch. Dist.*
    Case No. C08-5181FDB, 2008 WL 4740159 (W.D. Wash. Oct. 24,
    2008), *aff'd*, 608 F.3d 540 (9th Cir. 2010) ........................................ 21

*Boling v. Public Employment Relations Bd.*
    5 Cal. 5th 898 (2018) .......................................................................... 28

*Bond v. Floyd*
    385 U.S. 116 (1966) ....................................................................... 20, 26

*Brown v. Entm't Merchants Ass'n*
    564 U.S. 786 (2011) ................................................................. 23, 31, 32

*Carey v. Brown*
    447 U.S. 455 (1980) ............................................................................. 30

*City of El Cenizo, Texas v. Texas*
    890 F.3d 164 (5th Cir. 2018) ........................................................... 23, 24

*Cnty. Sec. Agency v. Ohio Dep't of Commerce*
    296 F.3d 477 (6th Cir. 2002) ............................................................... 19

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*
    657 F.3d 936 (9th Cir. 2011) ............................................................... 31

*Doe v. Harris*
    772 F.3d 563 (9th Cir. 2014) ......................................................... 18, 33

*El Rancho Unified Sch. Dist. v. National Education Assn.*
    33 Cal. 3d 946 (1983) ......................................................................... 29

-5-

*Elrod v. Burns*
    427 U.S. 347 (1976) ................................................................... 11, 33

*Garcetti v. Ceballos*
    547 U.S. 410 (2006) ............................................................................ 22

*Inglewood Teachers Assn. v. Pub. Employment Relations Bd.*
    227 Cal. App. 3d 767 (1991) .............................................................. 28

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*
    138 S. Ct. 2448 (2018)..................................11, 13, 14, 15, 17, 18, 23, 26, 27, 30

*Jenevein v. Willing*
    493 F.3d 551 (5th Cir. 2007) .............................................................. 22

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*
    385 U.S. 589 (1967) ....................................................................... 24, 25

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ........................................................ 19, 33

*Long Beach Area Peace Network v. City of Long Beach*
    522 F.3d 1010 (9th Cir. 2008) ............................................................ 19

*Miller v. Town of Hull*
    878 F.2d 523 (1st Cir. 1989) ............................................................... 21

*NAACP v. Button*
    371 U.S. 415 (1963) ............................................................................ 25

*Nevada Comm'n on Ethics v. Carrigan*
    564 U.S. 117 (2011) (Kennedy, J., concurring) .................................. 20

*NLRB v. Lenkurt Elec. Co.*
    438 F.2d 1102 (9th Cir. 1971) ............................................................ 32

*Reed v. Town of Gilbert, Ariz.*
    135 S. Ct. 2218 (2015)........................................................................ 30

*Republican Party of Minnesota v. White*
    536 U.S. 765 (2002) ............................................................... 20, 22, 31

*Rosenberger v. Rector & Visitors of Univ. of Virginia*
    515 U.S. 819 (1995) ....................................................................... 23, 24

-6-

*Schacht v. United States*
    398 U.S. 58 (1970) ............................................................. 24

*Short v. Brown*
    893 F.3d 671 (9th Cir. 2018) ........................................... 18

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*
    739 F.2d 1415 (9th Cir. 1984) ........................................ 18

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd*
    502 U.S. 105 (1991) ........................................................ 30

*Steam Press Holdings, Inc. v. Hawaii Teamsters*
    302 F.3d 998 (9th Cir. 2003) .......................................... 32

*Tenney v. Brandhove*
    341 U.S. 367 (1951) ........................................................ 21

*Thalheimer v. City of San Diego*
    645 F.3d 1109 (9th Cir. 2011) ........................................ 19

*Thomas v. Collins*
    323 U.S. 516 (1945) ........................................................ 29

*Tschida v. Motl*
    924 F.3d 1297 (9th Cir. 2019) ............................... 23, 24, 30

*Tucker v. State of Cal. Dept. of Educ.*
    97 F.3d 1204 (9th Cir. 1996) .......................................... 22

*United States v. Wunsch*
    84 F.3d 1110 (9th Cir. 1996) .......................................... 29

*Velez v. Levy*
    401 F.3d 75 (2d Cir. 2005) ....................................... 20, 22

*Waters v. Churchill*
    511 U.S. 661 (1994) ........................................................ 22

*Winter v. Natural Res. Def. Council Inc.*
    555 U.S. 7 (2008) ............................................................ 18

-7-

*Wood v. Georgia*
370 U.S. 375 (1962) .................................................................................. 21

<u>Statutes</u>

Cal. Gov't Code § 3541.3(i) ......................................................................... 29

Cal. Gov't Code § 3550.......................................................................... passim

Cal. Gov't Code § 16645, S.B. 285 ......................................................... 12, 14

NLRA §8(c) .................................................................................................. 13

U.S. Constitution First Amendment ..11, 18, 19, 20, 21, 22, 24, 25, 28, 30, 32, 33, 34

<u>Other Authorities</u>

Adam Ashton, "Get a state job and meet your labor rep: How state
budget protects California unions." *Sacramento Bee*, June 14, 2017 ................. 14

An Nguyen Ruda et al., California Labor Employment Law Update:
Key Changes In 2017 And What's Slated For 2018, *Mondaq*, Nov.
29, 2017 ...................................................................................................... 14

*Charter Oak Unified School District*, PERB Dec. No. 873 ...................................... 13

*City of Monterey* PERB Decision No. 1766-M (2005) ....................................... 28, 29

*Hartnell*, PERB Decision No. 2452E, p. 25 (2015) ................................................ 13

*Rio Hondo Community College District*, PERB Decision No. 128E....................... 13

Daniel DiSalvo, "Janus Barely Dents Public-Sector Union
Membership." *The Wall Street Journal*, February 14, 2019 ............................... 15

Tim Yeung, "Governor Signs SB 285: Prohibits Discouraging Union
Membership." *CalPerbBlog*, October 17, 2017 .................................................... 15

California School Board Association, A Post-Janus World: Analyzing
the Aftermath of Janus v. AFSCME .................................................................. 15

*San Diego Teachers Association, CTA/NEA*, PERB Decision No. 137
[June 19, 1980] ................................................................................................ 27

*SEIU Local 721 v. County of Riverside*
   PERB Decision No. 2119-M [June 24, 2010]......................................................28

Tim Yeung, AB 285: "Public Employers Cannot Discourage Union
   Membership." *CalPerbBlog*, April 4, 2017 ........................................................14

*United Teachers/Los Angeles, Charging Party, v. Marc and Eva Stern
   Math and Science High School, et al.*
   PERB Case No. LA-CE-6362-E through LA-CE-6366-E and LA-
   CE-6372-E through LA-CE-6377-E ....................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

In the name of "employer neutrality" and "employee freedom," California recently enacted a sweeping prohibition, in the form of Government Code Section 3550, which bars public employers from saying anything that could "deter or discourage" public employees from becoming or remaining members of an employee organization.  The effect of Section 3550 is to chill elected officials from voicing their opinions about the advantages and disadvantages of public sector unionization by censoring only one side of that debate.  Section 3550 one-sidedly skews public discussion in favor of public employee unions by effectively silencing any local elected official who would criticize unions, unionization, or positions taken by public sector labor organizations.

Plaintiffs are elected members of various local California government bodies, including city councils, school boards, and community college and special purpose districts.  Section 3550's threat of liability and possible contempt whenever a court order enforcing Section 3550 is violated, coupled with a complete lack of guidance as to compliance, is already chilling the ability of elected officials, including Plaintiffs, to speak freely about public employee unions and the implications of collective bargaining proposals coming before the public boards on which they serve.  That is because under Section 3550's sweeping ban, even objectively accurate information about public employee unionization might conceivably "deter or discourage" employees from becoming or remaining union members.

Plaintiffs are justifiably concerned that Section 3550's explicit viewpoint discrimination, coupled with its vague and overbroad terms, leave them at the mercy of whatever hindsight inference may be drawn whenever they engage in a public discussion about unions or unionization.  Section 3550's sponsors justified this extraordinary restriction of free speech as a means to protect employee free choice in the exercise of workplace representation rights.  The effect of Section 3550 is to

squelch debate and information necessary to make that choice an informed one, a point all but conceded by the author of Section 3550, who explained that "[i]f employers successfully convince their employees not to become union members or to withdraw from the union, this weakens the employees' collective power through union representation." RJN, Ex. A [Assembly Floor Analysis at 2].

The First Amendment and California law protect the ability of elected officials like Plaintiffs to freely discuss and advocate matters of public concern, whether through political or official activities. Elected officials have both the right and the obligation to enter the field of political controversy. The protection of political speech is not only intended to secure freedom of expression, but to safeguard the ability of the actions of local elected officials to reflect the will of their constituents, rather than the *dictat* of the California Legislature.

Accordingly, Plaintiffs respectfully request a declaration that Section 3550 abridges the freedom of speech of officials elected to governing boards of a public employer in this state, and violates the First Amendment of the U.S. Constitution. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs have suffered and shall continue to suffer Section 3550's chilling restrictions on core political speech, and therefore are entitled to an immediate and permanent injunction barring the enforcement of Section 3550 as to Plaintiffs and all similarly-situated elected representatives of public employers.

## II.   <u>STATEMENT OF FACTS</u>

### A.   **Section 3550**

On June 27, 2018, the U.S. Supreme Court held in *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448 (2018), that the First Amendment prohibits states from compelling public employees to pay "agency fees" to fund union activities, including those relating to collective bargaining. In anticipation of that decision, the California Legislature passed a series of measures

-11-

designed to bolster public union support and to shield union finances from the effects of the Court's ruling.  Complaint ¶¶ 26, 28.  One of those measures was Senate Bill ("S.B.") 285, which states: "A public employer shall not deter or discourage public employees from becoming or remaining members of an employee organization."

Like other collective bargaining statutes governing public employers, S.B. 285 (later codified as Government Code Section 3550), is subject to the enforcement power of the California Public Employment Relations Board ("PERB").  Unlike prior legislation, which already prohibited the use of state funds by public employers and state contractors "to assist, promote, or deter union organizations," Gov't Code Section 16645, S.B. 285 is not viewpoint neutral, as it prohibits a public employer from deterring or discouraging – but not assisting, promoting, or encouraging – unions or unionization.

According to the Assembly and Senate Floor analyses, the ostensible purpose of S.B. 285 is to "ensure that public employers shall remain neutral when their employees are deciding whether to join a union or to stay in the union," RJN, Ex. B [Office of Senate Floor Analyses at 4].  Yet, the bill, as written, enjoined only certain conduct and speech that might bear on the employee's freedom of choice – *i.e.*, speech that might deter or discourage, as opposed to encourage or promote, unionization.

The bill's author also claimed that Section 3550 would "ensure that public employees remain free to exercise their personal choice as to whether or not to become union members,"  RJN, Ex. C [Assembly Committee at 3] by closing a "loophole" in existing California law:

> [C]urrent law prohibits public employers from interfering with, intimidating, restraining, coercing, or discriminating against public employees while exercising their right to have union representation in the workplace or not. However, this protection does not extend to employees who are choosing whether or not to become or remain union members.  Currently, there is nothing to stop public employers from engaging in unfair tactics in an attempt to

-12-

> convince or coerce their employees to withdraw from
> union membership.

RJN, Ex. C [Assembly Committee at 3].

Existing law already prohibited public employers from interfering with the rights of public employees and applicants in the exercise of their right "to form, join, and participate in the activities of employee organizations of their own choosing. . .",  Compl. ¶ 25.  Instead, Section 3550 prohibits any conduct that could conceivably "deter or discourage" employees from becoming or remaining union members.  On its face, this prohibition precludes public employers from offering opinions on the merits of unionization or even stating facts that might bear directly on an employee's decision whether to join or remain a union member—for instance, a summary of the *Janus* decision's prohibition on mandatory agency fees.  Rather than addressing a "loophole," Section 3550 restricts the ability of public officials to openly discuss the potential drawbacks of unionization, without limiting in any way their ability to tout the benefits of union membership.[2]

---

[2]  This directly contradicts longstanding statutory law and PERB precedent which holds that "[a]n employer may freely express or disseminate its views, arguments, or opinions on employment matters, unless such expression contains a threat of reprisal or force or promise of benefit."  *Hartnell*, PERB Decision No. 2452E, p. 25 (2015); *see also City of Oakland*, PERB Decision No. 2387-M, p. 25 (2014) (applying the "safe harbor" protections found in NLRA section 8(c) to the MMBA, even though the MMBA includes no express "employer free speech" provision); *Rio Hondo Community College District*, PERB Decision No. 128E, at p. 18-19 (1980) ("While this Board is aware that the EERA contains no provision paralleling Section 8(c) of the NLRA, we find that a public school employer is nonetheless entitled to express its views on employment related matters over which it has legitimate concerns in order to facilitate full and knowledgeable debate. . . . While the protection afforded the employer's speech is not without limits, it must necessarily include both favorable and critical speech regarding a union's position provided the communication is not used as a means of violating the Act.").  But even where allegations arguably establish that an employer's "statements are false, misleading and derogatory, [the statements do not] constitute unlawful communication [if their] expression contains no threat of reprisal or force or promise of benefit."  *See Charter Oak Unified School District*, PERB Dec. No. 873 at p. 15-16 (1991).

-13-

Commentators noted that S.B. 285, like other California legislation passed in anticipation of the *Janus* decision, was intended to "bolster[] labor groups as they prepare for court decisions that may cut into their membership and revenue."  RJN, Ex. G [Adam Ashton, "Get a state job and meet your labor rep: How state budget protects California unions." *Sacramento Bee*, June 14, 2017, https://www.sacbee.com/news/politics-government/the-state-worker/article156146364.html].  Others commented that "SB 285 likely attempts to protect labor unions if the Supreme Court holds that agency fees cannot be imposed on public sector employees in *Janus v. AFSCME*."  RJN, Ex. H [An Nguyen Ruda et al., "California Labor Employment Law Update: Key Changes In 2017 And What's Slated For 2018." *Mondaq* (November 29, 2017)]; *see also* RJN, Ex. E [Tim Yeung, "Governor Signs SB 285: Prohibits Discouraging Union Membership," California PERB Blog, October 17, 2017 http://www.caperb.com/2017/10/17/governor-signs-sb-285-prohibits-discouraging-union-membership/] ("In my opinion, this law is another preemptive measure by organized labor to deal with the potential loss of agency fees depending on the outcome of the *Janus* case.").  Still others noted that the statute's undefined use of the terms "deter" and "discourage"  would likely chill employer speech.  RJN, Ex. I. [Tim Yeung, AB 285: *Public Employers Cannot Discourage Union Membership*, California PERB Blog, (April 4, 2017), http://www.caperb.com/2017/04/04/sb-285-public-employers-cannot-discourage-union-membership/] ("What if an employee comes to an employer with questions about what it means to be a member of the union, and the employer provides truthful responses. For example, assume that the employer confirms that being a member will mean paying dues. What if that has the effect of deterring or discouraging the employee from joining the union?").

Section 3550 became effective January 1, 2018.  On June 27, 2018, the day *Janus* was decided, Governor Newsom signed S.B. 866, which (among other things) extends the scope of Section 3550.  As amended, Section 3550 now reads: "A public

-14-

employer shall not deter or discourage public employees *or applicants to be public employees* from becoming or remaining members of an employee organization, *or from authorizing representation by an employee organization, or from authorizing dues or fee deductions to an employee organization. This is declaratory of existing law*." 2018 Cal. Legis. Serv. Ch. 53 (S.B. 866) (amendments to S.B. 285 italicized).

Reporters and commentators were quick to describe the reach of Section 3550, including the extent to which even true statements of fact or accurate recitations of law could run afoul of Section 3550, such as informing public employees about: (1) how to opt out of union membership, RJN, Ex. D[3]; (2) the amount of union dues a public employee must pay, RJN, Ex. E[4]; or (3) even that public employees do not have to pay union dues if they do not join the union under *Janus*, RJN, Ex. F.[5]  While the threat of a Section 3550 enforcement action itself could chill public employer speech on a range of topics important to both their constituencies and public employees, that potentiality is, as discussed below, not a hypothetical concern.[6]

**B.     The Plaintiffs**

Plaintiffs are elected members of various local California government bodies, including city councils, school boards, and community college and special purpose districts.  Every one of these public employers engages on a regular basis with

---

[3]  *See* RJN, Ex. D, Daniel DiSalvo, "Janus Barely Dents Public-Sector Union Membership," *The Wall Street Journal*, February 13, 2019.

[4]  *See* RJN, Ex. E, Tim Yeung, "Governor Signs SB 285: Prohibits Discouraging Union Membership," *CalPerbBlog*, October 17, 2017,

[5]  *See* RJN, Ex. F, California School Board Association, A Post-Janus World: Analyzing the Aftermath of Janus v. AFSCME, http://link.csba.org/m/1/85483239/02-b18178-44cb04ff0fd74d0aab7f1219e41e4413/6/494/8be755e5-c52c-4d95-a216-851c32518cf6

[6]      *See, e.g., United Teachers/Los Angeles, Charging Party, v. Marc and Eva Stern Math and Science High School, et al*. PERB Case No. LA-CE-6362-E through LA-CE-6366-E and LA-CE-6372-E through LA-CE-6377-E (alleging that 11 charter schools violated Section 3550 based on communications from staff and administrators to faculty).

public sector unions, whether in connection with collective bargaining proposals, representation elections, or various public issues on which the union might express a position before the Plaintiffs' governing body.  *See, e.g.* Barke Decl. ¶ 4; Ferguson Decl. ¶ 9; Reardon Decl. ¶¶ 10-11; Sachs Decl. ¶¶ 4, 6; Yarbrough Decl. ¶ 7; Anderson Decl. ¶¶ 7, 10; Dohm Decl. ¶ 16.  Each of these Plaintiffs is charged with representing his or her constituencies in the management of his or her respective public entity's affairs, including negotiations with public employee unions and speaking about important issues relating to unionization.  Each Plaintiff has occasion to speak about unions, unionization, or union-related issues in a range of contexts including town hall meetings to union negotiations to political campaigns. *See* Barke Decl. ¶¶ 4, 15; Yarbrough Decl. ¶¶ 9-10; Dohm Decl. ¶¶ 11, 16; Sachs Decl. ¶¶ 5, 6, 13; Ferguson Decl. ¶¶ 10-11; Reardon Decl. ¶¶ 9-10, 18, 20; Anderson Decl. ¶¶ 7, 11-12, 29, 35.  It is not unusual for Plaintiffs to engage directly in labor-management discussions, as well as to take positions on the terms of a proposed collective bargaining agreement.  Dohm Decl. ¶ 16; Barke Decl. ¶ 4; Ferguson Decl. ¶ 9; Reardon Decl. ¶¶ 10-11; Sachs Decl. ¶¶ 4, 6; Yarbrough Decl. ¶ 7; Anderson Decl. ¶¶ 7, 10, 35.  Each of the Plaintiffs have been delegated the responsibility, as a member of the public entity's governing board, to oversee (or to engage in) collective bargaining negotiations.  *See* Barke Decl. ¶ 4; Sachs Decl. ¶ 6; Anderson Decl. ¶¶ 10-11; Ferguson ¶ 9-10.

In the wake of S.B. 866's enactment, public officials, including Plaintiffs, were advised by various public employer associations to expect that Section 3550's "deter or discourage" prohibition "will be broadly construed."  Anderson Decl. ¶ 19. In June 2018, for example, the California School Boards Association ("CSBA"), a nonprofit education association representing the elected officials who govern public school districts and county offices of education, prepared a legal advice letter, model school board policy, and a publicly-available YouTube video advising local school boards on how to comply with various provisions of S.B. 866, including Section

3550.  *Id.* at ¶ 16.  One of the Plaintiffs, Leighton Anderson, has served as a Delegate to the CSBA since 2000.  *Id.* at ¶ 13.

In its legal guidance, CSBA advised that "*board members should be mindful of their communications with the public* and District or County Office of Education staff.  *This is true whether board members are answering questions or addressing the public regarding union participation and activity*."  *Id.* at ¶ 18 (emphasis added).  The guidance notes that its purpose "was to protect [CSBA's] members from unknowingly incurring unnecessary risk through involvement with employees who rightfully may have serious questions about union membership."  *Id.*

The guidance further recommends, "[i]f an employee asks you questions about the *Janus* case, the recent legislation, or whether to join or stay in the union, we strongly recommend that you refer them to your district or county office of education staff to answers to those questions.  *We also recommend that you be mindful of any comments that you may make that could be construed as deterring or discouraging union participation as we expect this limitation will be broadly construed*."  *Id.* at ¶ 19 (emphasis added).  In subsequent guidance, CSBA attorneys re-emphasized that, "[f]or questions involving an employee's status with the union, whether a dues-paying member or an agency fee payer, and to avoid the pitfalls created in large part by SB 866, the best thing to do is to refer the employee to the superintendent or to management staff identified as the superintendent's designee."  *Id.* at ¶¶ 19, 27.  To that end, the guidance concluded that "it is critically important that *board members, as representatives of the District*, are aware of these limitations on communications regarding union participation and tailor any comments or responses to questions accordingly."  *Id.* at ¶ 19 (emphasis added).  Other Plaintiffs have received similar advice.  *See* Compl., ¶¶ 32-34.

Section 3550's vague, one-sided prohibition on public employer speech, in tandem with the advice widely promulgated by California public employer associations such as CSBA and the League of California Cities, has directly

MOTION FOR PRELIMINARY INJUNCTION

1   impacted Plaintiffs' ability or willingness to speak publicly about union-related

2   issues, including the implications of the *Janus* decision.  *See*, *e.g.*, Barke Decl. ¶ 8;

3   Sachs Decl. ¶¶ 13, 17.  Plaintiffs avoid these topics not only at official board and

4   city council events, but also when approached informally by their constituents with

5   questions regarding public policy that could potentially implicate Section 3550's

6   broad language.  *See*, *e.g.*, Dohm Decl. ¶¶ 15, 17.  In at least one instance, the

7   governing board of the Los Alamitos Unified School District was advised by legal

8   counsel not to discuss *Janus v. AFSCME* with its employees.  Barke Decl. ¶ 16.

9   ### III.   <u>STANDARD OF REVIEW</u>

10      "A plaintiff seeking a preliminary injunction must establish (1) that he is

11  likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the

12  absence of preliminary relief, (3) that the balance of equities tips in his favor, and

13  (4) that an injunction is in the public interest."  *Doe v. Harris*, 772 F.3d 563, 570

14  (9th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

15  (2008)).  Plaintiffs need not show that they will prevail at trial, but only that they are

16  "likely" to prevail.  *Winter*, 555 U.S. at 20.  The Ninth Circuit applies a "sliding

17  scale" test, whereby "a preliminary injunction may still issue" on "less than

18  'likelihood of success'" provided that there are "serious questions going to the

19  merits" and "the balance of hardships tips sharply in the plaintiff's favor."  *Short v.*

20  *Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (emphasis added) (quoting *Shell Offshore,*

21  *Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).  A "serious

22  question" is one on which the movant "has a *fair* chance of success on the merits."

23  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984)

24  (emphasis added) (internal quotation marks and citation omitted).

25      The law favors preliminary injunctions to protect First Amendment rights.

26  "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court

27  has endorsed what might be called a 'hold your tongue and challenge now' approach

28  rather than requiring litigants to speak first and take their chances with the

-18-

consequences." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003).  This is particularly true where a plaintiff seeks to preliminarily enjoin a statute that restricts "political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable . . .'" *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008) (quoting *NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984)).

Given the severe chilling effects that restrictions on political speech are likely to have, a moving party need only show that it can satisfy the requisite degree of success on the merits to warrant a preliminary injunction.  Once this showing is made, it follows that the remaining preliminary injunction factors—irreparable injury, balance of the equities, and public interest—also are satisfied.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009) ("Given the free speech protections at issue in this case, however, it is clear that [the remaining preliminary injunction] requirements are satisfied."); *see also Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) ("[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights.").  To show that it is likely to succeed or have a fair chance of success on the merits, the moving party need only make a "colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011).  The burden then "shifts to the government to justify the restriction." *Id*.

IV.   <u>**PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS**</u>

A.   **Elected Officials Must Have Wide Latitude To Express Their Views On Political Or Policy Issues, And Any Law Restricting Such Speech Is Subject To Strict Scrutiny.**

The First Amendment prohibits states from restricting the speech of elected officials.  *See*, *e.g., Bond v. Floyd*, 385 U.S. 116, 135 (1966) (a state cannot "limit[] its legislators' capacity to discuss their views of local or national policy"); *Republican Party of Minnesota v. White*, 536 U.S. 765, 781-82 (2002) (law prohibiting judicial candidates from announcing their views on disputed legal and political issues violated First Amendment).  Such restrictions undermine the basic premise of representative government—that is, elected officials must be responsive to and speak on behalf of their constituencies.

"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."  *Bond*, 385 U.S. at 135-46.  Indeed, "[l]egislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them."  *Bond*, 385 U.S. at 136-37; *see also Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 131 (2011) (Kennedy, J., concurring) ("'[T]he right of citizens to band together in promoting among the electorate candidates who espouse their political views' is among the First Amendment's most pressing concerns." (quoting *Clingman v. Beaver*, 544 U.S. 581, 586, 125 (2005)); *Velez v. Levy*, 401 F.3d 75, 97-98 (2d Cir. 2005) (restrictions of elected officials' speech "offend[s] the basic purposes of the Free Speech clause— the facilitation of full and frank discussion in the shaping of policy and the unobstructed transmission of the people's views to those charged with decision making.").

This principle dates back to the founding of our nation.  As James Wilson, one of the first Supreme Court justices and a signatory to both the Constitution and Declaration of Independence, wrote:

> In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of everyone, however powerful, to whom the exercise of that liberty may occasion offence.

*Tenney v. Brandhove*, 341 U.S. 367, 373 (1951) (quoting 2 Works of James Wilson, Andrews ed. 1896, p. 38).  More recently, the Supreme Court explained that legislative protections in connection with the "uninhibited discharge of their legislative duty" is not for the "private indulgence" of elected officials "but for the public good."  *Id.* at 377 ("One must not expect uncommon courage even in legislators.  The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.").

Courts thus afford the speech rights of elected representatives the highest degree of First Amendment protection.  *See Wood v. Georgia*, 370 U.S. 375, 394-95 (1962) ("The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.").  This includes the speech rights of school board members and other elected local officials.  *See e.g., Blair v. Bethel Sch. Dist.*, Case No. C08-5181FDB, 2008 WL 4740159, at *3 (W.D. Wash. Oct. 24, 2008) ("There is no question that political expression such as Blair's positions and votes on School Board matters is protected speech under the First Amendment."), *aff'd*, 608 F.3d 540 (9th Cir. 2010); *Miller v. Town of Hull*, 878 F.2d 523, 532 (1st Cir. 1989) ("[W]e have no difficulty finding that the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee

of the first amendment. This is especially true when the agency members are elected officials.").  Such officials are no less a part of the democratic system than state representatives or members of Congress.  As the Second Circuit explained in *Velez*, "the very structure of the [school] community board system . . . supposes a striving toward [] democratic ends.  Members are elected to provide additional voices—to oppose, critique, supplement, modify, and suggest policies—so that the Chancellor and the City Board can more effectively deliver education to the students. . ."  *Velez*, 401 F.3d at 98.

In other words, local elected officials are not like "ordinary state employee[s]" who can, under certain circumstances, be subject to limited workplace speech restrictions imposed by their government employer.  *Jenevein v. Willing*, 493 F.3d 551, 557 (5th Cir. 2007) (The relationship of "an elected holder of state office . . . with his employer differs from that of an ordinary state employee.").[7]  Rather, "[i]f the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles."  *Republican Party of Minnesota*, 536 U.S. at 788 (internal quotation marks omitted).

---

[7]  Even if Section 3550 is analyzed in the context of government employee speech cases, it would still violate the First Amendment.  "[E]mployees cannot be forced to relinquish their First Amendment rights simply because they [] received the benefit of public employment."  *Tucker v. State of Cal. Dept. of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (citing *Pickering v. Board of Educ.*, 391 U.S. 563 (1968)).  "So long as [public] employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).  As explained more below, Section 3550 unquestionably limits speech on matters of public concern, and there is no plausible argument that Section 3550 is necessary to ensure employer efficiency.  Moreover, here the State is exerting control over speech not in its capacity as employer, but as sovereign.  Under these circumstances, the "workplace order" justifications fall away, requiring a more compelling basis for restraining core political speech.  *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 674-65 (1994) (noting that where the government is acting as a sovereign, rather than as an employer to ensure the efficient operation of a state agency, the government's interests in achieving its goals are generally subordinate to the need to safeguard protected speech).

Given the vital importance of unfettered political debate in the legislative context, laws that "regulate the substance of elected officials' speech" are subject to "strict scrutiny." *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 184 (5th Cir. 2018) (citing *Williams–Yulee v. The Fla. Bar*, 135 S. Ct. 1656, 1665-66 (2015)); *see also Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019) (applying strict scrutiny to state ethics provision prohibiting legislators from disclosing contents of ethics complaint).  Such regulations can only survive constitutional challenge if they are "narrowly drawn and [] necessary to serve a compelling state interest." *Tschida*, 924 F.3d at 1303 (internal quotations omitted).  This is "a demanding standard," and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (internal quotations omitted).

### B.     Section 3550 Is A Blatantly Unconstitutional Form Of Viewpoint Discrimination.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).  Yet this is exactly what Section 3550 does.  It limits "public employer" speech only if it "deters or discourages" union membership but not if it promotes or encourages unions or union membership. Even an attempt to make a factually accurate and neutral statement could still fall within "deters or discourages" depending on what the person hearing the statement might think.

For example, an elected school board member or county official who gives a speech, publishes an op-ed, or responds to a constituent's inquiry by informing teachers and staff about the *Janus* opinion and its ruling that one can opt-out of agency fees could be subject to sanctions because someone might view that as deterring or discouraging membership in a union.  However, an elected official who communicates with his or her constituency about the benefits of union membership

-23-

would not.  This constitutes the most "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.  A law that leaves elected officials "free to praise" unionization while sanctioning others "for opposing it, cannot survive in a country which has the First Amendment."  *See Schacht v. United States*, 398 U.S. 58, 63 (1970).

Indeed, Section 3550's sweeping prohibition conceivably prohibits *any* public discussion that paints unions or unionization in anything but a purely positive light. There is virtually no limit on what could conceivably "deter or discourage" a public employee from joining or remaining with a union.  *See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 598-99 (1967) (statute prohibiting "seditious" statements unconstitutional because it would inevitably cover protected political speech).

A recent decision of the U.S. Court of Appeals for the Fifth Circuit illustrates this point.  In *City of El Cenizo*, local officials sought a preliminary injunction to enjoin enforcement of an anti-sanctuary state law that prohibited local entities and police departments—*and the elected officials charged with operating them*—from "endorsing" any policy that "limits the enforcement of immigration laws."  890 F.3d at 182.  The court held that this would effectively prohibit elected officials from expressing their "support of or in favor of an idea or viewpoint," which constitutes "core political speech."  *Id*. at 183-84.  The Fifth Circuit stressed that the provision was so broad that "a local sheriff may violate [it] by answering questions at a local town hall meeting or press conference or testifying to a legislative committee."  *Id*. at 184.  Thus, the court determined the law was unconstitutional and "necessarily" warranted "injunctive relief."  *Id*.; *see also Tschida*, 924 F.3d at 1301 (ethics charge against elected official who disclosed contents of another ethics complaint violated the First Amendment).  Section 3550 suffers from the same defects.

C.    **Section 3550's Vague And Overbroad Terms Cannot Survive Constitutional Scrutiny.**

"[S]tandards of permissible statutory vagueness are strict in the area of free expression . . . .  Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 432-33 (1963).  Section 3550 provides no guidance for Plaintiffs to know when their speech might trigger the "discourage or deter" provision.  Section 3550's unconstitutionally vague and overbroad language, combined with the threat of punishment for expressing an opinion or even making a factual statement that may be construed as "deterring" or "discouraging" unionization, has already chilled elected official speech.  Dohm Decl. ¶¶ 6-8, 17; Barke Decl. ¶¶ 6-8, 14; Ferguson Decl. ¶¶ 5-8, 11-12, 15-17; Reardon Decl. ¶¶ 4-6, 9, 12, 14, 16, 18-20, 24; Sachs Decl. ¶¶ 9-11, 14, 17; Yarbrough Decl. ¶¶ 4-6, 8-9, 11-13; Anderson Decl. ¶¶ 5-9, 30, 34-38.

In *Keyishian*, the Supreme Court struck down a statute requiring removal of public school teachers "for 'treasonable or seditious' utterances or acts."  385 U.S. at 597.  The Court concluded that the statute was unconstitutionally vague because "[t]he teacher cannot know the extent, if any, to which a 'seditious' utterance must transcend mere statement about abstract doctrine, the extent to which it must be intended to and tend to indoctrinate or incite to action in furtherance of the defined doctrine." *Id*. at 599.  The same is true here.  Plaintiffs and other officials have no way of knowing just when their speech crosses the line into a prohibited utterance because it might discourage or deter union membership.

For example, suppose a union insists on basing teacher salary on seniority, but a school board member believes that merit-based pay would be better for students.  Voicing that opinion could very well deter or discourage employees from joining or remaining with the union.  The same would be true if a school board member expressed his or her view that standardized tests were necessary to measure

-25-

student progress, while the union was opposed to using such metrics.  As noted above, however, elected officials not only have a right, but an "obligation to take positions on controversial political questions" so their constituents can be fully informed and have a voice in the legislative process.  *Bond*, 385 U.S. at 136-37.  Section 3550 prevents certain elected officials from discharging this duty.

In doing so, Section 3550 effectively suppresses speech on "fundamental questions of education policy."  *Janus*, 138 S. Ct. at 2476.  The topics of discussion implicated by Section 3550, however, do not stop there.  As the Court in *Janus* stressed, "unions express views on a wide range of subjects—education, child welfare, healthcare, and minority rights, to name a few."  *Id*. at 2475.  Moreover, "[u]nions can also speak out in collective bargaining on controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions.  These are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public."  *Id*. at 2476 (internal quotations and citations omitted).  Any time an elected representative speaks out against the union's position on one of these topics that too could be deemed to "deter or discourage" public employees from joining or remaining with a union.

As we explain below, when faced with the choice between risking sanctions and remaining silent, elected officials such as Plaintiffs are choosing not to say anything that may later be deemed to have deterred or discouraged unionization in their public agency.

**D.     Section 3550 Chills The Speech Of Elected Officials Like Plaintiffs.**

Plaintiffs have refrained and continue to refrain from speaking about unions, unionization, or even topics tangentially relating to unions out of fear their speech might trigger an unfair practice charge.  *See*, *e.g.*, Sachs Decl. ¶ 14.  Indeed, Plaintiffs have refrained from making even accurate factual statements in order to avoid liability under Section 3550.  For example, the LAUSD School Board

received legal guidance on Section 3550 stating that there was a high likelihood the Board would be sued if the Board spoke with LAUSD employees about the *Janus* decision.  Barke Decl. ¶ 15.  Board members have been reluctant to relay even purely factual information about the Supreme Court's decision, including that public employees could now leave the union without a continuing financial obligation to pay agency fees.  *Id*. at ¶ 17.  Public commentary on Section 3550 demonstrates that this concern is widely shared.  *See* pp. 5-6 *supra*.  These are just a few examples of ways in which Plaintiffs limit their speech in addressing topics that relate to unions out of fear that anything they say might violate Section 3550.

The fact that Section 3550's reference to a "public employer" does not expressly enjoin elected officials does not alter the chilling effect on the speech rights of Plaintiffs.  The question is not whether Plaintiffs themselves may be charged with a violation of Section 3550.  While PERB's jurisdiction extends only to the public employer itself, the allegedly wrongful conduct at issue inevitably is the result of the actions of those deemed to have acted with the actual or implied authority of the government entity.  As shown below, there is substantial cause to believe that PERB or a court may decide to impute the public statements of elected officials to the representative body on which those officials sit.  It is that very uncertainty itself that chills and deters otherwise protected speech.

For example, in *San Diego Teachers Association, CTA/NEA*, PERB Decision No. 137 [June 19, 1980], PERB concluded that letters of commendation that two school board members placed in the personnel files of teachers who had not participated in a strike constituted discriminatory reprisal could be imputed to the school board itself.  *Id*. at 9-10.  PERB reached this conclusion even though the two members had acted without authorization and the board had never approved or ratified their conduct.  In fact, the letters were contrary to the policy that had been adopted by the board majority to not sanction the teachers who had participated in

-27-

1   the strike.  *Id*. at 7.  Nonetheless, PERB imposed a cease and desist order not only

2   on the school but also its elected "representatives."  *Id*. at 28.

3       Similarly, in *Boling*, the California Supreme Court held that the city of San

4   Diego committed an unfair practice when its mayor spearheaded a citizens' pension

5   reform initiative without first meeting and conferring with public sector unions as

6   required by California law.  Even though the "meet and confer" requirement only

7   applied to "governing bodies" (*e.g*., the city of San Diego), and the mayor had

8   championed the citizens' initiative on his own accord without official sanction from

9   the city, the Supreme Court held that the mayor's conduct could be attributed to the

10  city itself.  *Boling v. Public Employment Relations Bd.*, 5 Cal. 5th 898, 919 (2018).

11  Uncertainty is magnified by the lack of any bright-line rules governing imputation

12  of an elected official's statements or conduct based on an allegation that the elected

13  official was functionally acting as a "public employer," and such uncertainty leads

14  to an impermissible chilling of free speech in violation of the First Amendment.

15      In determining whether government officials are acting as "agents" of a

16  public employer, courts and PERB apply a "case-by-case approach" based on

17  whether "the employees could reasonably believe" the government official was

18  "acting within the scope of his or her employment" when he or she "committed an

19  unfair labor practice."  *Inglewood Teachers Assn. v. Pub. Employment Relations*

20  *Bd.*, 227 Cal. App. 3d 767, 780 (1991).  For example, based on statements made by

21  two elected supervisors during a public meeting, PERB has held the County of

22  Riverside interfered with the rights of both employees and SEIU under the MMBA.

23  *SEIU Local 721 v. County of Riverside*, PERB Decision No. 2119-M [June 24,

24  2010] at pp. 22-23 ("First, the County cites no authority, nor have we found any, for

25  the proposition that a public official's statements during a public meeting are

26  immunized from scrutiny under collective bargaining statutes.  On the contrary,

27  PERB has held that a local agency may be held liable under the MMBA for the

28  conduct of its governing body in official proceedings. (*City of Monterey* (2005)

1   PERB Decision No. 1766-M.)").  Section 3550 provides no guidance as to what
2   statements might violate Section 3550, let alone any direction as to what speakers
3   might subject a public employer to liability under its "deter" or "discourage"
4   prohibition if they were to speak on anything union related.  Elected officials who
5   engage in expressive conduct that could conceivably be deemed to deter or
6   discourage union membership could find themselves and their governing entity
7   subject to a cease and desist order.  If they violate that order, they could further be
8   subject to contempt sanctions.  *See* Cal. Gov't Code § 3541.3(i) (authorizing PERB
9   to "take any action in respect of [unfair practice] charges . . . as the board deems
10  necessary to effectuate the policies of this chapter"); *see also El Rancho Unified*
11  *Sch. Dist. v. National Education Assn.*, 33 Cal. 3d 946, 961 (1983) (describing
12  PERB's powers to enforce its orders and seek contempt).  Like Plaintiffs, many
13  elected representatives will simply choose to hold their tongues when faced with
14  these threats.

15      It thus is impossible for Plaintiffs and other elected officials to determine in
16  advance whether their speech could be considered as equivalent to the speech of a
17  "public employer."  This leaves elected officials "wholly at the mercy of the varied
18  understanding of [their] hearers," which "blankets with uncertainty whatever may be
19  said" and "compels the speaker to hedge and trim."  *Thomas v. Collins*, 323 U.S.
20  516, 535 (1945); *see also United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir.
21  1996) (law was impermissibly vague where "it would be impossible to know when
22  [] behavior would be offensive enough to invoke the statute" and it "is likely to have
23  the effect of chilling some speech that is constitutionally protected").  As such,
24  absent an order clarifying that Section 3550 is unconstitutional insofar as it limits
25  the speech of elected representatives, this provision will continue to chill expressive
26  conduct of Plaintiffs and others.

27

28

### E.   Because Section 3550 Is Not Narrowly Tailored To Achieve A Compelling State Interest It Cannot Survive Strict Scrutiny.

Because it limits elected official speech and discriminates based on viewpoint, Section 3550 can only survive if it is narrowly tailored to achieve a compelling state interest. *Tschida*, 924 F.3d at 1303. It is not. The ostensible purposes of Section 3550 are to: (1) "ensure that public employers shall remain neutral when their employees are deciding whether to join a union or to stay in the union," RJN, Ex. B [SB 285 Senate Floor Analysis at 4], and (2) "ensure that public employees remain free to exercise their personal choice as to whether or not to become union members," RJN, Ex. A [SB 285 Assembly Committee Hearing at 2]. Even assuming these interests would otherwise justify intruding on core First Amendment rights—they do not—Section 3550 is not narrowly tailored to achieve either.

First, Section 3550 does not promote public employer "neutrality." It chooses sides. If neutrality truly was the goal, then Section 3550 would be fatally underinclusive. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2232 (2015) (determining "that a statute's underinclusiveness" demonstrated it was not narrowly tailored); *Tschida*, 924 F.3d at 1305 ("Severe underinclusiveness renders the [content-based restriction] unconstitutional.").

Indeed, Section 3550's under-inclusivity reveals that "neutrality" was not the California Legislature's true goal viewed in light of the pretextual justification for this law, as well as the timing of its enactment. Section 3550 has little to do with "neutrality" and everything to do with bolstering unions in the wake of *Janus*[8] by

---

[8]   Even if the Legislature intended to further employer neutrality, this cannot save Section 3550. A First Amendment plaintiff is not required to show intent. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd*, 502 U.S. 105, 117 (1991) ("[I]llicit legislative intent is not the sine qua non of a violation of the First Amendment"). Regardless, "even the most legitimate goal may not be advanced in a constitutionally impermissible manner." *Carey v. Brown*, 447 U.S. 455, 464–65 (1980); *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231–32

restricting speech critical of unions or unionization.  *See Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").  In *Republican Party of Minnesota*—another case involving speech restrictions targeted at elected officials—the Supreme Court held that a law prohibiting candidates for judgeships from announcing their views on disputed legal issues was "so woefully underinclusive as to render belief in that purpose a challenge to the credulous."  536 U.S. at 780.  The same is true here.

Moreover, far from promoting neutrality, Section 3550 gives unions a decisive advantage in the collective bargaining process.  Section 3550 allows only the union's voice to be heard, including about whether or not public employees should unionize in the first place.  A public employer cannot openly state its position in the collective bargaining process, as admitting to an anti-unionization position could later be deemed a violation of Section 3550.  In this way, Section 3550 interferes with an effective collective bargaining process, a core function and responsibility of public officials such as Plaintiffs.

Section 3550 also is not narrowly tailored to promote employee free choice with respect to unionization.  The law as written does not solely prohibit coercive conduct (*e.g.*, acts of retaliation, discrimination, intimidation, or other acts of workplace interference) nor is it even limited to coercive speech (*e.g.*, threats to engage in such acts).  It also is not limited to false or misleading speech about the effects of unionization.  Rather, Section 3550 prohibits public employers from doing anything, including expressive conduct, that could "deter or discourage" union membership.  In this respect the statute is "significantly *overinclusive*" and therefore "not narrowly tailored."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948-49 (9th Cir. 2011) (emphasis added).

(1987) (holding the mere assertion of a content-neutral purpose cannot save a law that, on its face, discriminates based on content).

Suppose, for example, that a school board member truthfully informed his or her constituents about the cost of union dues, the potential impact the union's contract would have on the school budget, or the rights of school employees to vote against unionization or opt-out of agency fees if they choose not to become union members.  These acts could feasibly "deter or discourage" union membership.  Indeed, the law has the perverse result of cutting employees off from information necessary to make a free and fully informed choice.  Robust debate assists employees in making informed choices about representation.  *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1108 (9th Cir. 1971) ("The Supreme Court and this circuit are committed to the principle that debate in union campaigns should be vigorous and uninhibited . . . .  It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right."); *see also Steam Press Holdings, Inc. v. Hawaii Teamsters* 302 F.3d 998, 1009 (9th Cir. 2003) ("Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in 'uninhibited, robust, and wide-open debate.'").

In sum, Section 3550 is both underinclusive with respect to one of its purported rationales, but overinclusive with respect to the other.  *See Brown*, 564 U.S. at 805 (2011) (when a statute is both over- and under-inclusive it fails the requirement of narrow tailoring).  Thus, Section 3550 is facially unconstitutional— "Legislation such as this, which is neither fish nor fowl, cannot survive strict scrutiny." *Id*.

## V.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

Because Plaintiffs have a colorable First Amendment claim, it follows that they are likely to suffer irreparable injury absent an injunction.  *See, e.g., Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019)

("Because Plaintiffs have a colorable First Amendment claim, they have
demonstrated that they likely will suffer irreparable harm if the Ordinance takes
effect."); *Doe*, 772 F.3d at 583 ("A colorable First Amendment claim is irreparable
injury sufficient to merit the grant of relief.") (internal citations omitted).  The risk
of irreparable injury is particularly acute where, as here, the statute restricts political
speech where "timing is of the essence."  *Klein*, 584 F.3d at 1208 (quoting *Long
Beach Area Peace Network*, 522 F.3d at 1020).  Moreover, "[t]he loss of First
Amendment freedoms, for even minimal periods of time, unquestionably constitutes
irreparable injury." *Elrod*, 427 U.S. at 373.

Indeed, here, timing is particularly of the essence because Section 3550
prevents Plaintiffs from engaging with their constituencies, in real time (or at all)
and thereby hampers their ability to represent those constituencies effectively.
Indeed, Plaintiffs now refrain from addressing topics that even tangentially relate to
unionization out of fear that such speech will subject either themselves or the
entities they serve to an unfair practice charge. *See, e.g.*, Reardon Decl. ¶ 12,
Anderson Decl. ¶ 9.  For instance, in 2008, Mr. Anderson once questioned
California Teacher Association ("CTA") members about the use of CTA dues
money to campaign against a ballot measure that some segments of CTA's
membership supported.  Anderson Decl. ¶ 29.  However, Mr. Anderson now refrains
from making similar comments out of fear of an unfair practice charge.  Further,
Ms. Ferguson, a proponent of fiscal responsibility, worries that mentioning the
impact a new bargaining agreement would have on limited city resources would
trigger Section 3550.  Ferguson Decl. ¶ 11.  As such, she refrains from addressing
such issues and feels limited in her ability as a public official to speak with her
constituents about important public issues. *Id.*

Moreover, Section 3550 also deprives these constituencies from receiving
information about the advantages and disadvantages of particular collective

-33-

1  bargaining agreements or collective bargaining more generally.  Absent an

2  injunction, these irreparable injuries will continue unabated.

3  **VI.    THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS'**

4  **FAVOR, AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC**

5  **INTEREST**

6      Plaintiffs' ability to satisfy the remaining preliminary injunction factors

7  likewise follows from their likelihood of establishing a First Amendment violation.

8  "The fact that [Plaintiffs] have raised serious First Amendment questions compels a

9  finding that . . . the balance of hardships tips sharply in [Plaintiffs'] favor."  *Am.*

10  *Beverage Ass'n*, 916 F.3d at 758 (quoting *Cmty. House, Inc. v. City of Boise*, 490

11  F.3d 1041, 1059 (9th Cir. 2007)).  The Ninth Circuit also has "consistently

12  recognized the significant public interest in upholding First Amendment principles."

13  *Id*. (quoting *Doe*, 772 F.3d at 583).  "Indeed, 'it is always in the public interest to

14  prevent the violation of a party's constitutional rights.'"  *Id*. (quoting *Melendres v.*

15  *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  These elements therefore also support

16  granting a preliminary injunction.

17  **VII.    CONCLUSION**

18      For the foregoing reasons, Plaintiffs respectfully request that the Court issue

19  an injunction prohibiting the enforcement of California Government Code § 3550

20  against Plaintiffs and other elected public officials, pending final judgment in this

21  case.

22

23

24

25

26

27

28

1 | Dated:  February 26, 2020

2 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4 | By         */s/ David A. Schwarz*
                          DAVID A. SCHWARZ

5 | LAW OFFICE OF MARK W. BUCHER
Mark William Bucher

6

7 | CENTER FOR INDIVIDUAL RIGHTS
Michael E. Rosman

8 | Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-35-